IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GREGORY F. BELCASTRO                    )
                                        )
                    Plaintiff,          )       CIVIL ACTION NO. 06-1721
                                        )
        v.                              )
                                        )
SEARS, ROEBUCK & COMPANY,               )
                                        )
                    Defendant.          )
                                        )

## MEMORANDUM OPINION

CONTI, District Judge.

        In this memorandum opinion, the court considers the motion for summary judgment (the "Motion") (Docket No. 35) filed by defendant Sears Roebuck & Company ("Sears" or "defendant"),[1] against all claims asserted by plaintiff, Gregory F. Belcastro ("Belcastro" or "plaintiff") under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621 *et seq*. ("ADEA").  After reviewing the record, considering the briefs in support of and in opposition to the Motion, viewing all disputed facts in plaintiff's favor and drawing all reasonable inferences in plaintiff's favor, the court concludes that because there are genuine issues of material facts in dispute, defendant's Motion will be denied.

---

        [1] According to the defendant, Sears is incorrectly identified in the caption of the complaint as "Sears Roebuck & Company."  Sears' correct name is "Sears, Roebuck and Co."

# I.     Factual Background

The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *see also Big Apple BMW, Inc. v. BMW of North America,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993) (When a court considers a motion for summary judgment, "[i]nferences should be drawn in the light most favorable to the nonmoving party, and where the nonmoving party's evidence contradicts the movant's then the nonmovant's evidence must be taken as true.").

## A.     Defendant and its Relevant Personnel

Defendant is a leading retailer providing a wide range of home merchandise, apparel and automotive products and related services to consumers throughout the United States and Canada. Joint Statement of Material Facts ("JS") (JS ¶ 1.)  Defendant has a full-line store (the "store") that offers automotive products and services in Washington, Pennsylvania. (*Id.* ¶ 2.)

From April 1, 2003 through March 16, 2006, Theresa Maksa ("Maksa") was employed as the store's manager.  (*Id.* ¶ 3.)  From 1997 through, at least, October 7, 2008, William Angott ("Angott") was employed as the store's auto center manager.  (*Id.* ¶ 5.)  Preceding Angott, Harry Smith ("Smith") was employed as the store's auto center manager for an undisclosed period of time.  (*Id.* ¶ 158.)  Clive Heller ("Heller") was employed as the store's auto center manager from October 1978 through October 1988.  (*Id.* ¶ 7.)

From 2000 through early August 2004, Debra D'Agaro ("D'Agaro") was an assistant manager in the store's auto center under Angott as manager.  (*Id.* ¶¶ 243-44.)  From 2000 until

October 2004, Thomas Mirabella ("Mirabella") also worked as an assistant manager in the auto center. (*Id*. ¶ 8.) From 1996 until her retirement in December 1999, Karen Bedillion ("Bedillion") worked as the store's auto center assistant manager. (*Id*. ¶ 9.)

For the last for twenty-one years, Wayne Livingood ("Livingood") worked as a service technician III ("tech III") in the store's auto center. (*Id*. ¶ 13.) Livingood's date of birth is October 10, 1966. (*Id*. ¶ 14.) From November 2002 to August 2005, Christopher Shaw ("Shaw") also worked as a tech III at the store's auto center. (*Id*. ¶ 15.) Shaw's date of birth is January 2, 1982. (*Id*. ¶ 16.) Darryl Craig ("Craig") worked as a tech III and was one of the youngest in that position. (*Id*. ¶ 166.)

At the relevant time period, Tina Zadwornyj ("Zadwornyj"), was a human resource consultant employed by defendant in Illinois to provide guidance to store level management across the county regarding human relations issues and application of policies and procedures. (*Id*. ¶¶ 71, 75.) During that same period, Solomon Chambers ("Chambers") was employed by defendant as an auto center sales associate. (*Id*. ¶ 184.)

## B.    Plaintiff's Employment

Plaintiff worked as a tech III at the store in the auto center from 1971 until his termination. (*Id*. ¶ 11.) Plaintiff's date of birth is June 5, 1953. (*Id*. ¶ 12.) Plaintiff was approximately fifty-one years, two months old on August 9, 2004, the day he was terminated from defendant's employment. (*Id*.) As the highest level of auto technician employed at this Sears Auto Center, tech III, plaintiff was responsible for all auto mechanical work Sears performed, including brakes, alignments, air conditioning, oil changes, tires and inspections. (*Id*. ¶¶ 36- 37.)

Plaintiff testified that defendant was trying to establish a basis for terminating him by writing him up all the time for minor infractions or customer comebacks. (*Id.* ¶ 122.) Plaintiff believed that he was scheduled to work more evening shifts than Livingood and Shaw and that, unlike others, his schedule was frequently changed at the last minute. (*Id.* ¶¶ 132-33.) Plaintiff also had problems scheduling his vacation days and parking in the customer area. (*Id.* ¶¶ 139, 145.) Plaintiff believes that he was discriminated against because, due to his tenure of employment, he allegedly made the most money of any mechanic and received enhanced sick-time benefits and vacation time. (*Id.* ¶ 147.)

Angott, Shaw and Bedillion testified that other similarly-situated employees not within plaintiff's protected class engaged in the same or similar conduct as plaintiff and were treated differently than plaintiff with regard to counselings or disciplinary actions. (*Id.* ¶ 123.) Angott testified that plaintiff was a good mechanic and that he hoped plaintiff would not be terminated. (*Id.* ¶ 149.)

### C.    Defendant's Personal Vehicle Policy

Defendant maintains an automotive group associate handbook that contains its guidelines for proper business conduct. (*Id.* ¶ 17.) Among those guidelines, defendant maintains a policy titled, "Working on Personal Vehicles." (*Id.* ¶ 18.) The policy states in relevant part:

> When our associates use the service area to service their own
> vehicles, customers are likely to be inconvenienced. This can
> create customer service problems that make us look
> unprofessional. Even after business hours, associates working on
> their own vehicles on the premises can be a serious safety risk. To
> assure the best possible service for customers – and maximize
> safety for our associates, Sears Automotive Group associates are
> not permitted to work on their own vehicles in any store at any

time[.] . . . Failure to comply with this policy is grounds for termination.

(*Id.* ¶ 19)(emphasis added).  The term "their own vehicle" is undefined.  (*Id.* ¶ 154.)  The policy makes no reference to family member's vehicles in its prohibition.  (*Id.* ¶ 223.)

In January 2001, plaintiff received a copy of the automotive group associate handbook and was aware that violation of the "personal vehicle policy" provided grounds for immediate termination.  (*Id.* ¶¶ 22-24, 222.)  Plaintiff completed a quiz regarding the handbook, and one of the quiz questions stated, "As a Sears Automotive Group Associate, when are you allowed to work on your own vehicle in the backshop?" with possible answers:  1) whenever the backshop is slow, 2) you are not allowed to work on your own vehicle in the backshop and 3) on your day off.  (*Id.* ¶¶ 27-28.)  Plaintiff answered the question on the quiz by checking the box next to the second choice "you are not allowed to work on your own vehicle in the backshop."  (*Id.* ¶ 30.)

### D.    Defendant's Personal Vehicle Policy in Practice

Plaintiff believes that he did not violate defendant's personal vehicle policy on August 7, 2004, because he had previously inspected his immediate family members' vehicles and was not disciplined for his actions.  (*Id.* ¶ 104.)  Plaintiff worked on his son's vehicle in the auto center in 2000.  (*Id.* ¶ 112.)  D'Agaro testified she examined the title to the car of plaintiff's son.  (*Id.* ¶ 256.)

On December 4, 2003, plaintiff inspected his daughter's vehicle, a 2001 Honda Civic.  (*Id.* ¶ 105.)  Angott was the auto center manager at that time, but was not in the auto center on that day because he was on vacation.  (*Id.* ¶ 107.)  Angott had managerial responsibility for the auto center and served as the immediate reporting supervisor of the assistant manager on duty

that day.  (*Id.* ¶¶ 106, 108.)  Defendant disputes that Angott was aware of plaintiff's inspection of his daughter's Honda on December 4, 2003.  (*Id.* ¶ 106.)

It is uncontested that defendant's records establish that on November 26, 2001, plaintiff inspected a vehicle belonging to his wife.  (*Id.* ¶ 113.)  Angott was the auto center manager at the time, but was also on vacation when that inspection was performed.  (*Id.* ¶ 114.)  Defendant contends that Angott had no knowledge of this inspection, or that plaintiff had apparently performed it.  D'Agaro and Chambers testified that the knowledge of lower level managerial personnel in the auto center would be imputed to direct reporting superiors within defendant's organization, such that the knowledge of Mirabella, D'Agaro[2] and Bedillion would be imputed to Angott.  (*Id.*)

Shaw testified that his understanding of the personal vehicle policy did not prohibit him from working on a vehicle owned by another member of his household and that he had worked on his family members' vehicles on a number of occasions without incident, including the vehicles of his mother and his father, with whom he lived at the time.  (*Id.* ¶ 295-97.)  Shaw testified that the first time he inspected his mother's car he "ran it past [Mirabella]" to make sure it was not against policy.  (*Id.* ¶ 298.)  On the occasion of one of the inspections, Shaw testified that he drove the vehicle in question to the automotive center.  (*Id.* ¶ 299.)   Craig testified that he fixed a flat on his personal truck and Mirabella watch him do it without intervening.  (*Id.* ¶ 300.)

Former auto center manager, Heller, held meetings with his auto associates to review the policy prohibiting work on personal vehicles.  (*Id.* ¶ 21.)  Heller, Angott and Bedillion each

---

[2]       The Joint Concise Statement of Material Facts contained an incorrect spelling by referring to D'Agaro as " DeGaro."

6

testified that they interpreted defendant's personal vehicle policy as prohibiting a mechanic from working on vehicles belonging to the mechanic or one of the mechanic's immediate family members. (*Id.* ¶¶ 100-02.) Angott did not discipline Shaw for working on a vehicle belonging to Shaw's uncle. (*Id.* ¶ 314.) Angott did not discipline Craig for working on vehicles belonging to Craig's brother or sister-in-law. (*Id.* ¶ 315.)

Bedillion testified that the usual disciplinary practice was to start by giving a verbal warning and that she understood that a "three write-up" rule, i.e., three written warnings before termination, generally applied to all of defendant's policy rule infractions, including specifically the "personal vehicle policy," with the only exceptions to the rule being theft and insubordination. (*Id.* ¶¶ 171, 181.) Bedillion was "not really" encouraged to consult with the handbook when she was implementing warnings or applying policies, and with three or possibly four write-ups, she understood that termination would be discretionary and not mandatory. (*Id.* ¶¶ 181-82.)

Sometime between 1996 and 1999, when plaintiff specifically asked Bedillion if he could work on his wife's vehicle, she told him that he could not work on the vehicle. (*Id.* ¶ 103.) On another occasion, Bedillion gave her permission for Craig to violate the policy by performing work on a vehicle owned by him in the course of servicing a customer's vehicle. (*Id.* ¶¶ 167-68.)

On September 24, 2003, defendant's records indicate that Shaw inspected a vehicle belonging to his parents after he inquired with the assistant manager at the time, Mirabella, about whether he could service his parents' vehicles. (*Id.* ¶¶ 117-18.) Shaw testified that Mirabella permitted him to do so and that Mirabella knew that Shaw lived with his parents at the time of this inspection. (*Id.* ¶¶ 118-19.) Likewise, Smith, the manager of the auto center who preceded

Angott, and under whom plaintiff worked, would put his "own vehicle" up on the rack in the auto center and work on it. (*Id.* ¶ 158.)

Chambers testified that he had observed other mechanics working on their own cars in the auto center, although he was not able to identify specific dates or whether others' work involved inspections, except that he was able to recall that Joe Orbin ("Orbin") had performed an oil change on his own vehicle. (*Id.* ¶ 196.)

Livingood, a tech III who worked with plaintiff at the auto center for a number of years, was surprised to hear in a meeting called by Angott, post-plaintiff's termination, about Angott's interpretation that defendant's "personal vehicle policy" prohibited an employee from working on an immediate family member's vehicle. (*Id.* ¶¶ 197-98.)

D'Agaro testified that she observed Craig and Livingood working on family members' vehicles. (*Id.* ¶ 257.) D'Agaro perceived Maksa was out to get rid of long term Sears' employees. (*Id.* ¶ 258.) D'Agaro was aware that plaintiff had approximately thirty years' service with defendant. (*Id.* ¶ 259.) D'Agaro and Livingood each testified that it was common knowledge that plaintiff was one of the older individuals in the auto center. (*Id.* ¶¶ 259, 276.)

Plaintiff was aware that defendant terminated another tech III in the auto center, Joseph Bromley ("Bromley"), when the assistant manager at the time discovered Bromley's violation of the personal vehicle policy. (*Id.* ¶ 31-32.) Bromley was not scheduled to work on the day in question and continued to work on the vehicle, titled in his own name, without a work order, after being told to stop doing so by the assistant manager. (*Id.*) Angott was the auto center manager at the time. Angott, however, was not present on the day of the infraction. (*Id.* ¶¶ 33-34.) At the time of Bromley's termination, Maksa had not yet transferred to the Washington store. (*Id.* ¶ 35.)

### E.     Plaintiff's Termination of Employment

On August 7, 2004, plaintiff (age fifty-one at the time) was scheduled to begin working at approximately 8:00 a.m.  (*Id.* ¶ 38.)  That morning he drove a Toyota Camry (the "Camry") to work in order to have the car inspected at Sears.  (*Id.* ¶ 39.)  The Camry was titled in the name of Deborah Belcastro, plaintiff's wife.  Plaintiff was a registered driver on the insurance policy for the Camry.  (*Id.* ¶¶ 40- 41.)  Plaintiff's wife was not present at the auto center when he brought in the Camry.  (*Id.* ¶ 42.)

Plaintiff, upon arriving at work, informed defendant's sales associate, Chambers, that plaintiff's wife's vehicle needed to be inspected.  (*Id.* ¶ 187.)  There were no other cars in the service area and no other customers to be waited on.  (*Id.* ¶ 188.)  Chambers wrote up the work order for the inspection and gave the paperwork to Angott.  (*Id.* ¶¶ 189-90.)  Chambers testified that after he gave Angott the paperwork for the inspection, Chambers asked Angott if he wanted to write up plaintiff's car for inspection.  (*Id.* ¶ 191.)  Angott said to go ahead and write him up. (*Id.*)  Chambers had already written up the work order before talking to Angott, and approached Angott, saying "[plaintiff] needs to get his wife's car inspected."  (*Id.*)  Angott took the work order and sat it on the counter.  (*Id.* ¶ 192.)

Angott handed plaintiff the work order to perform an inspection of the Camry and told him to perform the inspection.  (*Id.* ¶ 46.)  Chambers testified that Angott stood and watched plaintiff inspecting his wife's vehicle, although he could not say that Angott "was there the entire time". (*Id.* ¶ 195.)  Angott did not instruct plaintiff to refrain from working on the car.  (*Id.*)  D'Agaro testified that it was generally known in the auto center that plaintiff drove a red Chevy S10, and not a Camry.  (*Id.* ¶48.)  Plaintiff performed an inspection on the Camry, which he signed off on at

approximately 9:04 a.m.  (*Id.* ¶ 49.)  Chambers processed the work order and sale for plaintiff. (*Id.* ¶ 50.)

The only other mechanic scheduled to work at 8:00 a.m. that morning was Irvin "Nate" Sibert, a service technician I ("tech I"), who was not qualified to perform state inspections.  (*Id.* ¶ 43.)  Although not certain, plaintiff believed that another tech III, Wayne Livingood, who could inspect the Camry would be arriving later in the day.  (*Id.* ¶¶ 44, 45.)  Plaintiff stated that he inspected his wife's vehicle because there was no one else at that time qualified to do it, and his wife had to pick the car up early that day.  *(Id.* ¶ 42.)

Maska testified that initially she was informed about the inspection by the loss prevention manager.[3]  (*Id.* ¶ 52.)  She confronted Angott with the allegation that plaintiff had inspected his own vehicle and Angott confirmed it had happened, but "without his knowledge."  (*Id.* ¶¶ 52, 218-19.)  With Angott present, Maksa called plaintiff into the office and confronted him about the inspection of the Camry and stated that the personal vehicle policy prohibited him from working on his own vehicle.  (*Id.* ¶¶ 53-54.)  Plaintiff told Maksa that the Camry was his wife's vehicle and not his "own" vehicle.  (*Id.* ¶ 55.)  Maksa responded that plaintiff  was "not allowed to work on [his] wife's vehicle either."  (*Id.* ¶ 56.)

Maksa asked Angott for a written statement.  (*Id.* ¶ 61.)  Angott wrote that to his knowledge he had never allowed an employee to work on his or her own vehicle, and that he had never become aware that his assistant manager had allowed it.  (*Id.* ¶ 62.)  Maksa requested Mirabella to write a statement relating to the incident.  (*Id.* ¶ 69.)  Mirabella wrote that he never permitted any associates to work on their own vehicles.  (*Id.* ¶¶ 63-64.)  Upon questioning,

---

[3]     The loss prevention manager was not identified by name in the record.

Mirabella told Maksa and Angott that he had never permitted associates to work on their own cars. (*Id.* ¶ 69.) Maksa, however, testified that she had no recollection of making the request. (*Id.* ¶¶ 242, 286.) Neither Maksa nor Angott could recall taking Mirabella's statement. (*Id.* ¶ 69.) Mirabella included in his written statement a comment to the effect that he had never heard that his manager, Angott, allowed associates to work on their own vehicles and later testified that he had included the statement to protect Angott. (*Id.* ¶ 287.)

While in the office, Maksa asked plaintiff to "write down what happened." Plaintiff wrote: "I inspected my wife's vehicle because we had nobody at that time to do it, and she had to pick it up early. I knew I was not supposed to work on my vehicle but [there] was nobody else to do it." (*Id.* ¶ 57.) Maksa closed the meeting by telling plaintiff that she would contact Sears' Associate Service Center ("ASC") at Sears' headquarters in Illinois regarding the matter. (*Id.* ¶ 59.)

After the meeting among plaintiff, Angott and Maksa, Maksa contacted defendant's director of stores, William Seal ("Seal"), and the district automotive manager, Brian Kolb ("Kolb"), to report what had happened. (*Id.* ¶ 70.) Both informed Maksa that the alleged incident was grounds for termination, but did not inform Maksa that she was required to terminate plaintiff. (*Id.* ¶ 222.) Maksa informed Seal and Kolb that she would contact the ASC on the next business day, which was a Monday. (*Id.* ¶ 70.)

The ASC is a group of human resource professionals employed by defendant who provide guidance to store level management across the country regarding human relations issues and application of defendant's policies and procedures. (*Id.* ¶ 71.) Store management contemplating termination of an associate are required to call the ASC in order to review the factors and receive

guidance regarding whether or not termination would be appropriate based upon defendant's practices and policies. (*Id.* ¶ 72.)

Because the ASC does not operate on the weekend, Maksa placed the call to consult with the ASC regarding plaintiff's conduct on the following Monday, August 9, 2004, and was connected with Zadwornyj, a human resources consultant. (*Id.* ¶¶ 74-75.) During the call, Maksa represented that plaintiff had worked on his "own vehicle," had signed a statement admitting to that fact and had acknowledged in his handbook that he could not work on his "personal vehicle." (*Id.* ¶ 227.) Maksa conceded the difference between "personal vehicle" and "own vehicle" could be subjective. (*Id.* ¶ 224.)

Zadwornyj testified that her basic human resources training addressed consistent enforcement of policy as an important concern in order to ensure compliance with fair employment practices. (*Id.* ¶ 205.) To ensure that defendant was consistently applying its policies, Zadwornyj asked Maksa whether other automotive associates were permitted to work on their own vehicles or those of immediate family members. (*Id.* ¶ 204.) Maksa responded that no other associates at the auto center had been permitted to work on their own vehicle or vehicles of household family members. (*Id.* ¶ 78.) Zadwornyj interpreted defendant's personal vehicle policy as prohibiting work on vehicles owned by members of a mechanic's household, including a mechanic's wife. (*Id.* ¶ 77.) Zadwornyj did not instruct Maksa that she was required to terminate plaintiff, but advised Maksa that plaintiff's inspection of his wife's vehicle was a violation of the personal vehicle policy and that it was cause for immediate termination. (*Id.* ¶¶ 79, 207.)

Although Maksa denied informing Zadwornyj of any desire to terminate plaintiff or that Maksa was even considering doing so, she testified that Zadwornyj gave her "approval to

terminate" plaintiff. (*Id.* ¶¶ 228-29.) Maksa knew plaintiff was a "long-term employee." (*Id.* ¶ 236.) At the time Zadwornyj provided this counsel, she knew plaintiff's date of hire (1971) and that plaintiff had thirty-three years of service with defendant. (*Id.* ¶ 80.) As the store manager, Maksa had available to her sufficient personnel records for her to ascertain plaintiff's date of hire, years of service, and his age, although Maksa testified that she did not know plaintiff's age or tenure on August 9, 2004. (*Id.* ¶ 81.)

Maksa testified that she decided to proceed with termination based upon Zadwornyj's counsel. (*Id.* ¶ 83.) If Maksa would have objected to Zadwornyj's advice, a higher level manager would have reviewed the matter. (*Id.* ¶ 86.) After the call with Zadwornyj, Maksa called plaintiff and Angott to a meeting and informed plaintiff that his employment was terminated. (*Id.* ¶ 87.) Plaintiff does not recall saying anything in response. (*Id.*) Plaintiff retrieved his tools and left. (*Id.* ¶ 89.)

## II.    Procedural Background

On February 7, 2005, plaintiff filed a charge with the Equal Opportunity Employment Commission ("EEOC") against defendant alleging violations of the ADEA and the Pennsylvania Human Relations Act ("PHRA"). (Compl. ¶ 12.) (Docket No. 1.) Plaintiff was issued a right to sue letter by the EEOC, advising him of his right to institute a private action against defendant prior to January 2, 2007. (*Id.*. ¶ 13.) On December 29, 2006, plaintiff filed a complaint against defendant in this court. (Docket No. 1.) On July 23, 2008, defendant filed the instant Motion (Docket No. 35) and brief in support of the Motion (Docket No. 36), asserting that it is entitled to summary judgment because defendant's stated reason for terminating plaintiff was not pretext for

age discrimination under the ADEA.  Plaintiff argues that there are genuine issues of material fact with respect to whether defendant's proffered reason for terminating plaintiff was pretext for age discrimination.  (Docket No. 42.)

### III.    Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247-48 (1986).

In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Id*. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party.  *El v. Southeastern Pa. Transp. Auth.,* 479 F.3d 232, 238 (3d Cir. 2007).  The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted.  Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.*

## IV. Discussion

Plaintiff asserts a claim of age discrimination under the ADEA based upon his termination from defendant's employment on August 9, 2004. The ADEA makes it unlawful for an employer to discriminate against any person forty years of age and older with respect to compensation, terms, conditions, or privileges of employment on the basis of age. 29 U.S.C. § 623(a)(1). The legal framework by which ADEA claims are analyzed is well established. Different legal analyses apply depending on whether a case is a "mixed motives" case or a "pretext" case. *See Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The parties do no dispute that this case is a "pretext" age discrimination case and the familiar burden-shifting framework of *McDonnell Douglas* applies. The courts of appeals, including the United States Court of Appeals for the Third Circuit, have employed the *McDonnell Douglas* framework to analyze ADEA claims. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (citing *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc)).

The *McDonnell Douglas* framework requires a plaintiff alleging a violation of the ADEA to carry the initial burden and first establish a prima facie case of discrimination. *McDonnell Douglas Corp,* 411 U.S. at 802. The establishment of a prima facie case raises an inference of discrimination. *Tex. Dept. of Comty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Once a prima facie case is established, the burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, non-discriminatory reason for the employee's termination. *McDonnell Douglas Corp.,* 411 U.S. at 802. If a defendant meets this burden of production, then any presumption of discrimination drops from the case, and the plaintiff must offer evidence to demonstrate that the defendant's proffered reason was pretext, and not the true reason for the

employment decision. *Burdine*, 450 U.S. at 255. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Id.* at 253.

A.     **Prima Facie Case**

To state a claim for discrimination under the ADEA, a plaintiff ordinarily must show by a preponderance of the evidence that he: (1) was at least forty years of age; (2) was qualified for the position; (3) suffered an adverse employment decision; and (4) was replaced by a significantly younger person to permit an inference of discrimination. *See Brewer v. Quaker State Oil Ref. Corp.,* 72 F.3d 326, 330 (3d Cir. 1995). For the purposes of this Motion, defendant conceded that plaintiff can make out a prima facie case under *McDonnell Douglas.* Defendant must satisfy its burden of production and articulate some legitimate non-discriminatory reason for plaintiff's termination.

B. _   **Defendant's Showing of a Legitimate, Non-discriminatory Reason**

An employer satisfies its "relatively light" burden of production by introducing evidence which, taken as true, would permit a conclusion that there was a non-discriminatory reason for its employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer need not prove that the proffered reasons actually motivated the termination decision. *Id.*

Defendant offered evidence asserting that plaintiff was terminated for failing to follow defendant's personal vehicle policy when plaintiff inspected a vehicle titled solely in his wife's name. On August 7, 2004, plaintiff drove a Camry titled in his wife's name to defendant's auto center to have the car inspected. Defendant contends that plaintiff's conduct violated defendant's personal vehicle policy when plaintiff inspected the vehicle himself, because the policy in question

prohibited plaintiff from inspecting his wife's vehicle, who was a close family member living in the same household as plaintiff. Plaintiff does not dispute that he was given a copy of the automotive group associate handbook and was aware that the personal vehicle policy was in place. He completed a quiz correctly answering the question relating to the personal vehicle policy. After completing the inspection on the Camry on August 7, 2004, plaintiff made a written statement that he knew he was not supposed to work on his own vehicle.

Defendant offered a legitimate, non-discriminatory reason for plaintiff's termination, i.e. that plaintiff was terminated for failing to follow defendant's automotive group associate handbook personal vehicle policy. Defendant argues that summary judgment is appropriate based upon the failure of plaintiff to rebut defendant's legitimate, nondiscriminatory reason for plaintiff's termination. Plaintiff argues that he adduced sufficient evidence of pretext to raise a genuine issue of fact about whether defendant's stated reason for his termination was pretexual.

**C.    Pretext**

Upon defendant's production of a non-discriminatory reason for plaintiff's termination, the burden of persuasion shifts back to plaintiff to prove that defendant's real reason for terminating plaintiff was in fact discriminatory. *Fuentes,* 32 F.3d at 764. The Court of Appeals for the Third Circuit in *Fuentes* set forth a two-pronged analysis for considering how a plaintiff may show that the reason given by defendant was discriminatory.

> [A] plaintiff who has made out a prima facie case may defeat a motion for summary judgment by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. . . .

> . . . [P]laintiff's evidence rebutting the employer's proffered
> legitimate reasons must allow a factfinder reasonably to infer that
> *each* of the employer's proffered non-discriminatory reasons, . . .
> was either a *post hoc* fabrication or otherwise did not actually
> motivate the employment action (that is, the proffered reason is a
> pretext).

*Id.* (internal citations omitted). This standard places a difficult burden on the plaintiff. *Id.*

The two prongs of the *Fuentes* test are distinct and the court will analyze both prongs to determine whether plaintiff presented sufficient evidence to defeat defendant's motion for summary judgment. *See Keller,* 130 F.3d at 1108-13 (analyzing ADEA action under both prongs of *Fuentes* framework).

### 1. Prong One

Prong one of the *Fuentes* analysis focuses on whether plaintiff submitted evidence from which a factfinder could reasonably disbelieve defendant's articulated legitimate reasons for plaintiff's termination. Under this prong, plaintiff cannot just show that defendant's decision was wrong or mistaken, but rather, he must demonstrate:

> such weaknesses, implausibilities, inconsistencies, incoherencies, or
> contradictions in the [defendant's] proffered legitimate reasons for
> its action that a reasonable factfinder *could* rationally find them
> "unworthy of credence," . . . and hence infer "that the employer did
> not act for [the asserted] non-discriminatory reasons."

*Fuentes,* 32 F.3d at 765 (internal citation omitted) (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)).

> Of course, a decision foolish, imprudent, or incompetent by
> comparison to the employer's usual mode of operation can render it
> implausible, inconsistent, contradictory, or weak.

*Id*. at 765 n.8.

Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable factfinder could not believe it. For example, in *Brewer v. Quaker State Oil Refining Corporation*, 72 F.3d 326 (3d Cir. 1995), the plaintiff was terminated for deficient sales performance. The record disclosed that the plaintiff received a bonus three months before he was fired and that he was the only sales representative in the region who had received such a bonus. *Brewer*, 72 F.3d at 329. The court held that, where the primary measure of Brewer's performance was sales and he was the leading salesperson in the region, his employer's stated reason for his termination was contradictory to its admission that the most important standard of job performance was sales. *Id*. at 332. According to the court,

> [a] factfinder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program-sales.

*Id.*

Likewise, in *Sempier v. Johnson and Higgins*, 45 F.3d 724 (3d Cir. 1995), the employer stated that the plaintiff was terminated because of poor performance that had caused the company to restructure the nature of his responsibilities. The evidence of record, however, disclosed that (1) the plaintiff never received any unfavorable criticism that his performance was poor or inadequate; and (2) the employer failed to produce any other evidence of poor performance or to make specific allegations of the plaintiff's deficiencies. *Sempier*, 45 F.3d. at 731-33. Thus, there was evidence on the record that a reasonable factfinder could conclude that the reason given by the employer was pretextual. *Id.* at 732-33.

Similarly, in *Showalter v. University of Pittsburgh Medical Center*, 190 F.3d 231 (3d Cir. 1999), the Court of Appeals for the Third Circuit reversed a court's grant of summary judgment, concluding that issues of material fact existed about whether a supervisor's proffered reason for terminating an employee was pretextual. In *Showalter*, the supervisor testified that departmental seniority, rather than job seniority or overall seniority was always used to make RIF decisions. *Id*. The record, however, disclosed contradictory testimony of the defendant's personnel related to the implementation of the defendant's layoff policy based upon seniority status. *Id*. at 237. A human relations employee testified that the employer used one of three types of seniority to make reduction in force ("RIF") decisions: job seniority, department seniority, and overall hospital seniority. *Id*. The same human relations employee testified that the employer did not have a fixed policy about which type of seniority should be used when a layoff was to be made based on seniority, and that it was common practice in any RIF to look at alternative methods of calculating seniority to determine who would be affected by the layoff. *Id*. One supervisor's testimony corroborated the human relations employee's testimony. *Id*. The acting supervisor testified that as far as he knew department seniority was always used for RIF, contradicting the testimony of the human relations employee and the other supervisor. *Id*.

The Court of Appeals for the Third Circuit concluded that a reasonable factfinder could find that the acting supervisor's explanation for his choice of departmental seniority as the basis for termination was pretextual. The court explained that a reasonable factfinder could conclude that the acting supervisor had the discretion to choose any of the three forms of seniority and that he selected department seniority because he knew it would result in the layoff of the oldest employee. The court of appeals held that the lower court erred in holding that the plaintiff had not adduced

evidence from which a reasonable factfinder could disbelieve the defendant's articulated justification for terminating the plaintiff.

The court must view the evidence to determine whether defendant's stated reason for terminating plaintiff could reasonably be found by a jury to be pretextual. In the instant case, the evidence supporting defendant's explanation of plaintiff's termination consists primarily of evidence relating to plaintiff's understanding that defendant's personal vehicle policy existed and that plaintiff's violation of that policy was the basis for his immediate termination. Defendant argues that the quiz plaintiff took related to the policy shows that plaintiff understood the policy to include his own vehicle, along with plaintiff's written statement that:

> I inspected my wife's vehicle because we had nobody at that time to do it, and she had to pick it up early. I knew I was not supposed to work on my vehicle but [there] was nobody else to do it.

(JS ¶ 57.)

Defendant argues that its proffered legitimate business reason for terminating plaintiff cannot be contradicted absent plaintiff's ability to show that Maksa, the ultimate decision-maker in plaintiff's termination, had knowledge that anyone else at the auto center had ever worked on their own car, including cars of household family members. Defendant argues that in order to survive summary judgment, plaintiff must adduce evidence that Mirabella or someone else brought Shaw's September 24, 2003, inspection of his parents' vehicle to the attention of Angott, Maksa, or Zadwornyj.

Proof of pretext, however, does not have to include evidence of discrimination, but rather "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves,* 530

U.S. at 147. In *Kautz v. Met-Pro Corporation,* 412 F.3d 463, 467 (3d Cir. 2005), the court of

appeals illuminated the issue stating:

> Although *Reeves* makes clear that we may not require affirmative
> evidence of discrimination in addition to proof of pretext, it does not
> change our standard for pretext which "places a difficult burden on
> the plaintiff.". . . In order to avoid summary judgment, *Fuentes*
> requires a plaintiff to put forward "such weaknesses, implausibilities,
> inconsistencies, incoherencies, or contradictions in the employer's
> proffered legitimate reasons for its action that a reasonable factfinder
> *could* rationally find them unworthy of credence."

*Id.* (internal citation omitted).

Plaintiff points to the ambiguity of the use of the term "own vehicle" in defendant's

"personal vehicle" policy, which is otherwise undefined and does not expressly prohibit an

employee from working on a vehicle titled solely in the name of a family member living in the

same household as the employee. The ambiguity in the language would, standing alone, not

persuade the court that a factfinder, however, would conclude defendant's proffered reason for

plaintiff's termination was pretextual. The court is mindful that it is not the function of a court to

determine whether a defendant's business judgment in terminating a plaintiff was correct. *See*

*Ezold* at 527 (quoting *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) ("[b]arring,

discrimination, a company has the right to make business judgments on employee status,

particularly when the decision involves subjective factors deemed essential to certain positions.").

Testimony by defendant's managerial employees concerning their inconsistent actions with

respect to similarly situated employees who were not terminated for violating the person vehicle

policy implies pretext. *See Fuentes,* 32 F.3d at 765 n.8 ("Of course, a decision foolish, imprudent,

or incompetent by comparison to the employer's usual mode of operation can render it implausible,

inconsistent, contradictory, or weak."). There is evidence from which a reasonable factfinder could conclude that defendant's managerial personnel involved at some level in the decision to terminate plaintiff, i.e. Maksa, Angott, Zadwornyj and Mirabella, testified inconsistently about the events surrounding plaintiff's termination. First, Mirabella testified that he called to Angott's attention that plaintiff allegedly worked on his "own vehicle" on August 7, 2004. Maksa, however, testified that the loss prevention manager had made Angott aware of plaintiff's actions. Later, Maksa stated that she confronted Angott with the information and Angott confirmed that it happened but "without his knowledge." Angott, however, testified that it was he who called the incident to Maksa's attention. Maksa testified that when she contacted Zadwornyj, she expressed no desire to terminate plaintiff or that she was even considering termination. Maksa stated that she was given "approval to terminate" and that she was not directed to terminate plaintiff. Zadwornyj, however stated that Maksa had called her to seek approval to terminate plaintiff.

Other inconsistencies and contradictions in the record before the court relate to the personal vehicle policy, which prior to plaintiff's termination, had not been enforced with respect to defendant's auto associates working on family members' vehicles, nor was it generally understood by the auto associates to prohibit a tech from working on a family member's vehicle. Bedillion, an assistant auto center manager, permitted Craig, a tech III, to work on his own vehicle. Shaw, another tech III, had performed work, including state inspections on his parents' vehicles with the knowledge of both the assistant auto center manager, Mirabella and the auto center manager, Angott, without any disciplinary action. Craig and Livengood, another tech III, worked on family member's vehicles without any disciplinary action being taken. Defendant's auto center manager, Smith, worked on his personal vehicle in the shop. Defendant's sales associate, Solomon testified

that other techs employed in the auto center at the time had worked on and inspected their own vehicles. Plaintiff had previously worked on vehicles owned by his wife, daughter and son.

These facts become significant when considering the testimony of Zadwornyj, who specifically inquired of Maksa whether other auto associates were permitted to work on their own vehicles or those of immediate family members, and Maksa's response that others were not permitted to do so. Zadwornyj testified that her purpose in making that inquiry was to ensure that defendant was consistently applying its policies in compliance with fair employment practices.

The court finds that plaintiff adduced sufficient evidence for a trier of fact to disbelieve that defendant's proffered reason for Maksa to terminate plaintiff was plaintiff's violation of the personal vehicle policy. A finding in favor of plaintiff under the first prong of the *Fuentes* analysis is sufficient for the court to preclude summary judgment. Nonetheless, the court will consider the undisputed facts, along with viewing the disputed facts in favor of plaintiff, under the second prong of the *Fuentes* analysis.

## 2. _____Prong Two

To survive summary judgment under prong two of the *Fuentes* framework, to determine if plaintiff presented sufficient evidence of pretext, plaintiff must point to some evidence from which the factfinder could reasonably believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the defendant's action *Fuentes*, 32 F.3d at 764. The district court must focus on the legitimate, nondiscriminatory reason offered by the employer. *Ezold*, 983 F.2d at 531 (stating that a "plaintiff does not establish pretext, however, by pointing to criticisms of members of the non-protected class, or commendation of the plaintiff, in categories the defendant says it did not rely upon"). The court is neither permitted to get involved in the

subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination. *Id.* at 527.

In proving this prong, a plaintiff must point to evidence with "sufficient probative force that a factfinder could conclude by a preponderance of the evidence that age was a motivating or determinative factor in the employment decision." *Simpson v. Kay Jewelers, Division of Sterling, Inc.*, 142 F.3d 639, 644-45 (3d. Cir. 1998). The kinds of evidence the plaintiff may show are: 1) that the employer has previously discriminated against the plaintiff; 2) the employer has discriminated against other persons within the plaintiff's protected class; and 3) the employer has more favorably treated similarly situated persons not within the protected class. *Simpson*, 142 F.3d at 645. The court will examine whether Belcastro submitted that kind of evidence.

### a.      Evidence of previous discrimination against plaintiff

Because plaintiff did not present any evidence that defendant had previously discriminated against him, the court need not consider this category.

### b.      Whether defendant discriminated against other persons in plaintiff's protected class or another protected class

Similarly, because plaintiff did not present any evidence that defendant discriminated against other persons in plaintiff's protected class or another protected class, the court need not consider this category.

### c.      Whether defendant treated more favorably similarly situated persons not within the protected class

Here plaintiff adduced evidence probative of defendant having treated more favorably similarly situated persons not within the protected class.

> To be deemed similarly situated the individuals with whom a plaintiff seeks
> to be compared must have engaged in the same conduct without such

> differentiating or mitigating circumstances that would distinguish their
> conduct or the employer's treatment of them for it.

*Bullock v. Children's Hosp. of Phila.*, 71 F. Supp.2d 482, 489 (E.D. Pa 1999) (internal quotations

omitted).  This court finds plaintiff similarly situated with Shaw, Craig and Livingood, because

each was employed by defendant as a tech III mechanic and was engaged in conduct that would

have violated defendant's proffered interpretation of its personal vehicle policy, *i.e.,* worked on

their own or close family members' vehicles living in the same household.

Plaintiff adduced evidence of more favorable treatment regarding those other tech III

employees:  Shaw, had performed work, including state inspections, on his parents' vehicles with

the knowledge of both Mirabella and Angott without any disciplinary action taken against him; and

both Craig and Livingood had worked on family members' vehicles with knowledge of managers

and without incident.  In this case, the court finds defendant's treatment of Shaw, Craig and

Livingood sufficiently probative of the fact that defendant may have treated more favorably

similarly situated persons not within the protected class.


**V.      Conclusion**

The crux of the issue in this case is pretext.  Plaintiff produced sufficient evidence to raise

genuine issues of material fact concerning whether defendant's legitimate non-discriminatory

reason for the adverse employment action was not worthy of credence or whether his age was more

likely than not a motivating factor in the employment decision.  Under these circumstances,

summary judgment cannot be granted in defendant's favor.  A reasonable jury will need to

determine whether defendant's stated, non-discriminatory reason for terminating him was

pretextual.  Defendant's Motion for summary judgment will be DENIED.

By the court:

_/s/ JOY FLOWERS CONTI_
Joy Flowers Conti
United States District Judge

Dated: March 3, 2009